Israel Dahan
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2114
idahan@kslaw.com
*Attorney for Plaintiff Global Rewards LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GLOBAL REWARDS LLC**, <br><br> Plaintiff, <br><br> v. <br><br> **WEX BANK**, <br><br> Defendant. | CIVIL ACTION NO. 3:22-cv-1781 <br><br><br> JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Global Rewards LLC ("Global Rewards" or "Company") files this Original Complaint against Defendant WEX Bank ("WEX"), and in support thereof respectfully states as follows:

### I.   NATURE OF THE CASE

1.     This suit seeks damages arising from WEX's breaches of its contractual obligations under a Master Services Agreement Referral and Technology Support ("MSA"), attached as Exhibit 1, between WEX and Global Rewards, and other bad

faith conduct which severely harmed Global Rewards' business operations, goodwill and reputation.

2.    WEX's breaches were accomplished through a gradual, concerted effort to disrupt the contractual relationship with and business operations of Global Rewards after WEX sought to improperly terminate the MSA outright in early 2021. Indeed, unable to directly terminate the MSA, WEX decided to frustrate Global Rewards' business operations and client relationships by making improper demands and refusing to service Global Rewards' existing clients or to onboard its new clients. This bad faith and inexcusable conduct left Global Rewards with no choice but to look for an alternative banking partner at great cost, time, and business disruption. WEX's unlawful behavior has caused Global Rewards to sustain millions of dollars in damages.

3.    Global Rewards is a financial technology company that centralizes accounts payable processes into one streamlined application for businesses—its clients—while maximizing the businesses' ability to earn credit card rewards and rebates.

4.    The MSA governs two types of services that are integral to Global Rewards' operation: banking referral services and payment technology services.

5.    First, the MSA allows Global Rewards to provide its clients the ability to open accounts and apply for credit applications with WEX. To this end, prior to

WEX's unlawful conduct, Global Rewards referred *all* of its clients to WEX. When WEX approved them, the clients established banking relationships with WEX that were linked to the Global Rewards accounts payable platform. These clients would enter into two separate agreements: a Client Agreement with Global Rewards and a Participant Agreement with WEX.

6.      Second, under the MSA, WEX provides Global Rewards access to utilize WEX's virtual card program, which, among other things, enables Global Rewards' clients to initiate payments from WEX accounts through Global Rewards' platform to a third party.

7.      The MSA was signed on May 1, 2020. Although Global Rewards launched this venture with WEX during the COVID-19 pandemic, the Company was on an upward trajectory from the outset, signing on approximately thirty (30) clients in short time span, with many other lucrative client relationships forthcoming. Each of those early clients signed Participant Agreements with WEX. By all accounts, Global Rewards was doing exceedingly well immediately post-launch and its relationship with WEX was progressing steadily.

8.      However, Global Rewards' rapid success took an unexpected turn when, on Friday, January 22, 2021, representatives of WEX's parent, WEX Inc., orally notified Global Rewards that WEX would be terminating *all* services under the MSA effective the following Monday, January 25, 2021, including services

WEX provides to Global Rewards' customers through the separate Participant Agreements. WEX's abrupt decision to terminate lacked any context and came as a shock to Global Rewards.

9.     WEX's sudden attempt to terminate the MSA and the Participant Agreements would have been a blatant breach of the express terms of the MSA and would have caused irreparable harm to Global Rewards' business operations. In fact, such termination would have forced Global Rewards to breach its own contracts with its clients and inevitably lose those clients, thereby putting Global Rewards out of business and destroying its business reputation.

10.     On January 25, 2021, Global Rewards, faced with this untenable situation, asked WEX to explain its position and threatened suit and a temporary restraining order against WEX. On the eve of filing, WEX reversed course and informed Global Rewards that it would not terminate the MSA. But unfortunately, that was only lip service as WEX had no intention of truly continuing its business relationship with Global Rewards.

11.     Indeed, realizing it could not expressly terminate the MSA itself, WEX decided to act in a manner that would inevitably force Global Rewards to end the parties' relationship. To this end, WEX engaged in a series of purposeful bad faith conduct aimed at preventing Global Rewards from growing and effectively running its business, including making it nearly impossible for Global Rewards' new and

existing clients to open accounts with the bank, denying new clients' credit applications for arbitrary reasons, and otherwise stretching the client onboarding process to a near halt. Without the ability or confidence to sign up new customers with WEX, Global Rewards' business and growth suffered dramatically. Eventually, WEX left Global Rewards with no choice but to switch banking partners to an institution that would faithfully perform its end of the bargain.

12.    To add insult to injury, after months of disappointment and frustration with WEX, Global Rewards learned that WEX had been pursuing a business line in direct competition with Global Rewards. In other words, while WEX was learning the ins and outs of Global Rewards' business, it was also playing in the same financial technology space and offering its clients the same centralized accounts payable processes that Global Rewards was offering its clients.

13.    This explains WEX's initial effort to terminate its relationship with Global Rewards—it had entered the same business space and, therefore, wanted Global Rewards out of the way.

14.    As a direct result of WEX's unlawful and bad faith conduct, Global Rewards lost clients, quantifiable income, and reputational value. Global Rewards' damages are in the millions of dollars.

## II.   PARTIES

15.   Plaintiff Global Rewards is a New Jersey limited liability company with offices at 100 Boulevard of the Americas, Lakewood, NJ 08701.  All of its members are citizens of New Jersey.  More specifically, the members of Global Rewards are AFI Consulting Group LLC, a New Jersey limited liability company, BTM Holding LLC, a New Jersey limited liability company, Circle Place LLC, a New Jersey limited liability company, 965E24 LLC, a New Jersey limited liability company, and Stephen Schum, a citizen of New Jersey.

16.   WEX Bank is a Utah corporation and has its principal place of business at 111 East Sego Lily Drive, Suite 250, Sandy, UT 84070.  WEX Bank is registered as a foreign profit corporation in New Jersey as WEX Bank Inc.  WEX Bank may be served through the registered agent for WEX Bank, Corporation Service Company, at 15 West South Temple, Suite 600, Salt Lake City, UT 84101.  WEX conducts business in the State of New Jersey and worldwide.  WEX is a subsidiary of WEX Inc., a publicly traded company.

## III.   JURISDICTION AND VENUE

17.   This Court has personal jurisdiction over WEX because WEX is registered to conduct business in New Jersey and in fact conducts business with companies incorporated in the State of New Jersey.  WEX also engages in deliberate contact with New Jersey by entering into agreements, like the MSA, that govern the

providing of services to New Jersey entities, like Global Rewards.  Moreover, this dispute arises directly out of WEX's contract with Global Rewards, and it is fair that issues regarding such contract be litigated in New Jersey.  Further, WEX and its parent company had numerous communications with Global Rewards flowing out of the MSA that took place in the State of New Jersey.  WEX also has purposely directed its acts to this State by knowingly accepting payment transactions from Global Rewards' clients, many of which are New Jersey businesses.  Further, WEX has entered into Participant Agreements with New Jersey companies that were referred to WEX through Global Rewards pursuant to the MSA.

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states.  Plaintiff Global Rewards is a citizen of New Jersey, and Defendant WEX is a citizen of Utah.  Thus, there is complete diversity between the parties.

19.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court as this is the District within which Global Rewards is located and where the wrongful conduct occurred.

## IV.   <u>FACTS</u>

*Global Rewards' Services*

20.    Global Rewards provides its clients a technologically advanced accounts payable platform that streamlines corporate spending into one efficient database, while maximizing credit card rewards and rebates.  It is an efficient, cost-effective alternative to track, process, and remit corporate spending.

21.    Global Rewards developed its platform technology through extensive research and development in order to assure its effectiveness and value, requiring a significant investment (over $2,000,000) by Global Rewards.

22.    Global Rewards launched in 2019.  Between its launch and early 2021, and through its initial relationship with WEX, Global Rewards signed many corporate clients and received overwhelmingly positive feedback and substantial momentum.

23.    Global Rewards was expanding and building momentum by engaging additional clients ranging the corporate spectrum.  Indeed, by January 2021, Global Rewards had several new, multi-million-dollar value clients in the process of onboarding with Global Rewards and WEX.

24.    Critical to Global Rewards' platform's functionality is the ability for its clients to pre-fund a bank account and use virtual credit cards to pay vendors when amounts come due.  Without that component, Global Rewards' technology is

essentially worthless, as its clients would have no ability to actually move funds or obtain credit card awards.  As Global Rewards is a financial technology provider—but not a bank—it was necessary for Global Rewards to partner with a bank who could provide this critical component.

***Global Rewards And WEX Execute The MSA***

25.    Global Rewards scoured the market for the right banking partner.  It met with several banks but ultimately settled on WEX because WEX provided a full suite of services, including robust technology and favorable pricing terms, which other banks were unable to provide at the time.

26.    WEX provides customer credit applications, maintains credit lines, issues cards, and manages customer relations with clients.  WEX serves customers worldwide.  WEX is owned by WEX Inc., which provides technological payment solutions across continents and industries.

27.    Global Rewards initiated communication with WEX's parent company, WEX Inc., in December 2019.  In or around March 2020, Global Rewards began negotiating the MSA with WEX Inc. on behalf of WEX.  Due to the COVID-19 pandemic, Global Rewards conducted the negotiations of the MSA remotely from its offices in New Jersey.

28.    The MSA was signed on May 1, 2020.  The parties to the MSA are Global Rewards LLC and WEX Bank, a subsidiary of WEX Inc.  Yitzchok

Itzkowitz, Global Rewards' CEO, signed the MSA on behalf of Global Rewards, and Tim Laukka, WEX's President, signed the MSA on behalf of WEX.

29.    Article II of the MSA governs the services covered by the agreement.

30.    Section 2.1 governs Referral Services.  *See* Ex. 1 at § 2.1.  The MSA permits Global Rewards to "offer to its customers the ability to use Accounts issued by WEX." Ex. 1 at § 2.1.A.  Pursuant to subsection 2.1.A.ii., the parties agreed that the "Company shall provide the initial contact information to WEX and that any negotiations leading to a credit agreement being extended by WEX to the potential Participant [*i.e.*, a Global Rewards' client] for a WEX Program shall be the responsibility of WEX and upon authorization by WEX may also include the Company." Ex. 1 at § 2.1.A.ii.

31.    Section 2.2 governs Technology Services.  It states: "Company [*i.e.*, Global Rewards] provides technical services in the payments industry whereby their technology enables the processing of payments.  Using Company's services, a WEX virtual card can be used to make payments through a credit system." Ex. 1 at § 2.2.A. While the "Company's Services . . . are a separate and independent service from the WEX virtual card program," Ex. 1 at § 2.2.A.i., the MSA provides that "Company may connect with the WEX API or other WEX licensed or proprietary systems solely for the purpose of enabling the Participant to initiate a virtual payment from WEX through the Company's system to a vendor or payee of Participant."  Ex. 1 at

§ 2.2.A.ii.  The MSA further provides that "Company will be allowed to interface with WEX's systems in accordance with this Agreement and has developed a technical interface . . . that will allow Participants to utilize WEX virtual card numbers within Company's system.  Company and WEX may mutually agree to add additional payment capabilities at a future date."  Ex. 1 at § 2.2.A.v.

32.     Section 2.5 of the MSA states:

> All subsequent Participant agreements and any other documents or materials provided to Company by WEX shall contain a disclosure that WEX shall have no obligation whatsoever to any Participant until and unless the applicable Participant agreement is executed by the Participant and approved by WEX. Participants that sign an agreement will, if such agreement is accepted by WEX, have a direct business relationship with WEX and will be subject to the terms of the applicable agreement entered into by and between the Participant and WEX. WEX may suspend or terminate any Participant at their discretion pursuant to the terms and conditions of its agreement with the Participant. As a point of clarification, WEX has provided its standard terms currently in effect. All Participants that are referred by Company shall be offered such terms as the basis for any contract negotiation.

33.     Further, the MSA provides that WEX will pay Global Rewards an Incentive Fee "based upon the total monthly net spend of Participants that were referred by Company and entered into an agreement with WEX as set forth in Schedule I attached hereto and incorporated herein."  Ex. 1 at § 4.1.

34.     The services provided for in the MSA with WEX, combined with Global Rewards' sophisticated software, was a recipe for success.  Indeed, in only

short period of time, Global Rewards signed at least thirty (30) large corporate clients to utilize the platform, each of which also signed Participant Agreements with WEX and utilized the WEX virtual card program to make payments.

*Global Rewards' Separate Contracts With Its Clients*

35.     As noted above, Global Rewards enters into separate contracts with its clients to govern the separate relationship between Global Rewards and the client (the "Client Agreement").  Upon information and belief, WEX was, at all relevant times, aware of the existence of these Client Agreements because Global Rewards discussed them with WEX and WEX Inc. representatives throughout the course of their business relationship.

36.     The Client Agreements require Global Rewards to provide a functioning corporate card and accounts payable platform.  In addition, the Client Agreements obligate, among other things, Global Rewards to provide access to accounts through an issuing bank—which, pursuant to the MSA, was WEX—to accomplish the financial services provided by the Global Rewards platform.  Thus, the Client Agreements were dependent upon the relationship between Global Rewards and WEX as established in the MSA.

*WEX's Unlawful Attempt To Unilaterally Terminate The MSA And The Participant Agreements*

37.     Up until January 22, 2021, Global Rewards and WEX had a productive and positive working relationship.  Neither party ever alleged a contractual breach

in any form or fashion, and to the best of Global Rewards' knowledge, things were progressing well.

38.     On January 15, 2021, Mr. Itzkowitz, the CEO of Global Rewards, emailed his contacts at WEX Inc. to discuss the issuance of credit terms with respect to existing accounts and the onboarding of new and pending client accounts.  The parties set up a call for 11:00 a.m. on January 22, 2021.

39.     On that scheduled January 22 call, instead of discussing credit terms, the WEX Inc. representatives informed Mr. Itzkowitz and the Global Rewards team that WEX was going to terminate the MSA, effective Monday, January 25, 2021. Global Rewards was further told that, effective January 25, WEX would stop servicing all Participant Agreements between WEX and Global Rewards' clients.

40.     Mr. Itzkowitz and other Global Rewards officers on that call were shocked, as the announcement lacked any context whatsoever.  They inquired why WEX was taking these actions, but the WEX Inc. representatives would not provide any further detail.

41.     Article V, Section 5.1 of the MSA provides that the term of the MSA shall be "for a period of five (5) years."  Further, nothing in that Article permits WEX's immediate, unilateral termination of the MSA and the Participant Agreements. Ex. 1 at § 5.1.

42.     As the MSA was signed on May 1, 2020, there remained approximately four and one-half years on the Agreement's initial five-year term.   Accordingly, WEX's early termination would have been premature and in violation of Section 5.1 of the MSA.

43.     The remainder of Article V of the MSA governs the circumstances under which a party may terminate the Agreement.   Specifically, Article V, Section 1.1 provides that "if the Defaulting Party materially defaults [under the MSA], and does not cure such breach within thirty (30) days after written notice thereof is given by the Non-Defaulting Party," the Non-Defaulting Party may terminate.   Ex. 1 at Art. V, § 1.1.

44.     Global Rewards received no notice of a material default whatsoever, and certainly no notice of default with thirty (30) days to cure.   In any event, Global Rewards did not perform any act that would constitute a default under the MSA, and it undoubtedly did not perform any act constituting a *material* default under the MSA.   Accordingly, WEX's attempted, immediate termination of the MSA also would have been a breach of Article V, Section 1.1 of the Agreement.

45.     Article V, Section 1.2 of the MSA permits a party to immediately terminate with notice upon the occurrence of certain specified events, including bankruptcy, a material adverse change in the nature of the business, or the failure to comply with regulatory requirements.   Ex. 1 at Art. V, § 1.2.   It is undisputed that

no such termination event occurred.  Indeed, WEX did not provide Global Rewards with notice of the occurrence of any such event.  Thus, WEX was not permitted to terminate the MSA under this provision, either.

46.     Importantly, the MSA clearly provides that Participant Agreements survive any purported terminating of the MSA and that "WEX shall continue to pay the Incentive Fee to Company from and after the termination of this Agreement for the duration of such Participant's agreement term[.]"  Ex. 1 at Art. V, § 1.3.

47.     Notwithstanding this provision, WEX also attempted to terminate all Participant Agreements along with its termination of the MSA.  This action would have constituted a further breach of the MSA and would render Global Rewards' platform useless, with many corporate clients unable to facilitate payments to their vendors through the platform *or* through their bank directly.

***WEX Withdraws Its Improper Termination Attempt, But Then Embarks On A Campaign To Destroy Global Rewards' Business And Thereby Force Global Rewards To End The Relationship***

48.     On January 22, 2021, counsel for Global Rewards sent an urgent letter to Tim Laukka in his capacity as President of WEX and signatory to the MSA.  In the letter, counsel explained why WEX's planned termination of the MSA and the Participant Agreements was wholly improper under the express terms of the MSA.  Global Rewards' counsel also explained that termination would cause irreparable harm to Global Rewards' business and reputation.

49.     WEX made no attempt to resolve the parties' dispute. Under the assumption that WEX would be terminating the MSA on January 25, 2021, Global Rewards notified WEX on Sunday, January 24, 2021 that it would file injunction papers in federal court the next day if WEX did not provide a satisfactory response by that morning.

50.     After additional back-and-forth between the parties over the next day, WEX ultimately assured Global Rewards that it "does not intend to take action unilaterally." Accordingly, Global Rewards did not file a complaint or injunction papers at that time.

51.     But WEX's about-face was only temporary. Shortly after the improper unilateral termination dispute was resolved, WEX began a new campaign to end its relationship with Global Rewards. This campaign would aim to force *Global Rewards* to terminate the MSA, rather than WEX doing so itself.

52.     WEX understood that Global Rewards had several new clients and related revenue streams in the pipeline. WEX also understood that Global Rewards was a new company experiencing significant momentum, and that Global Rewards would have to continue onboarding new clients at a rapid rate in order to maintain that momentum. WEX also knew that in order to onboard these new clients to Global Rewards' platform, the clients needed to open an account and banking

relationship with WEX.   Thus, to some extent, WEX could control Global Rewards' future growth and profitability.

53.    But rather than act in accordance with its express contractual obligations and its implied good faith and fair dealing obligations to Global Rewards, WEX instead chose to act in a manner that would inevitably impede Global Rewards' growth and, even worse, its continued service of existing customers.  To this end, WEX abused its role in Global Rewards' onboarding process by purposefully processing Global Rewards' new client applications at a snail's pace, sometimes leaving the application unreviewed for months at a time.  WEX did this despite the fact that Global Rewards' new clients submitted credit applications to WEX in a timely fashion.

54.    Global Rewards repeatedly informed WEX that its clients' applications were stuck in the queue and pressed WEX to provide a timeline for approval.  Indeed, WEX's sudden slowdown forced Global Rewards to monitor the status of its new clients' banking applications—a function Global Rewards never previously performed or agreed to perform—and to insert itself into the Client/WEX application process in the hopes that WEX would finally move the applications along.

55.    WEX's slow application review process was completely arbitrary and differed significantly from its review process prior to the attempted termination in January 2021.

17

56.   In the past, WEX efficiently reviewed, approved, and provided feedback on new client applications.  But following WEX's attempted improper termination of the MSA, WEX repeatedly sent Global Rewards requests for miscellaneous information about its clients, which Global Rewards consistently provided to the best of its ability.  And despite Global Rewards' compliance with WEX's requests, Global Rewards did not see any movement on its clients' applications, an issue that Global Rewards consistently raised to WEX.

57.   In fact, WEX strung Global Rewards along, noting, "We are continuing our review and expect to be completed in the next couple of days."

58.   But days turned to weeks, and there was still no reasonable explanation for WEX's delay.   Notably, Global Rewards' clients were not submitting applications in higher volumes than prior to the attempted termination.  Moreover, Global Rewards' clients were legitimate creditworthy entities, so review and approval of their credit applications should not have taken significant amounts of time—and certainly should not have taken longer than before the attempted termination.

59.   Eventually, WEX did make determinations on new Global Rewards' client credit applications and many were denied arbitrarily or for creditworthiness. Such denials were clearly unfounded.  For instance, the bank denied many of Global Rewards' clients that opted to pre-fund their accounts.  Because a pre-funded

account is by definition already funded, and the bank provided no reason for the denial, these rejections made little sense.  The bank's denials for creditworthiness similarly lacked any basis; such applications were properly accompanied by supporting documentation proving that the client had sufficient credit.

60.     In fact, Global Rewards is aware of instances where WEX denied a new credit application even though the client *had an existing WEX account* that was opened prior to the attempted termination.  Clearly, as WEX already had a banking relationship with this client and never sought to terminate that relationship, WEX had newfound, ulterior motives for denying the application.

61.     For example, a Global Rewards client had an active account with WEX and attempted to open an additional account to separate its spending and accounting. The additional account was denied for no apparent reason.

62.     And WEX's misconduct was not limited to new client applications.  On February 15, 2021, WEX informed Global Rewards that it was not only seeking more information from new applicants—after a prolonged review period—but it had also sent requests for additional information to "most of [Global Rewards'] *existing* customers" who already satisfied WEX's credit standards and had previously been approved by WEX.

63.     For example, in December 2020, a Global Rewards client received approval from WEX to open an account that included a credit line of up to $75,000,

pending verification of the company's beneficial owners.  After the documentation verifying the company's beneficial owners was provided in January, WEX reversed course and denied the earlier credit approval.

64.    WEX denied Global Rewards' client applications notwithstanding that, at the outset of WEX and Global Rewards' relationship, WEX specifically told Global Rewards that clients applying for under $150,000 in credit would only be required to provide company financials if their FICO score was insufficient, and clients seeking prefunded accounts would not need to provide financials so long as they provide information on the company's beneficial owners and business verification.

65.    Thus, by February 2021, it became clear to Global Rewards that WEX was not interested in a long-term partnership with Global Rewards and would not honor its express and implied contractual obligations under the MSA.

66.    Accordingly, on February 22, 2021, Mr. Itzkowitz, the CEO of Global Rewards, emailed Mr. Laukka, the President of WEX, that WEX's conduct is a breach of its contractual obligations and implied good faith obligations to Global Rewards.  In his email, Mr. Itzkowitz noted that WEX's conduct had caused significant harm to Global Rewards and its clients, leaving Global Rewards with "no choice but to look for a new provider, which will likely take 90-120 days to get in place."  Finally, Mr. Itzkowitz demanded WEX's assurance that WEX would not

take any further action to harm Global Rewards' business while working to secure a new provider. Global Rewards never received such assurance from WEX.

67.    By July 28, 2021, Global Rewards had identified a new provider and requested that WEX facilitate the transfer of certain accounts to Global Rewards' new provider.

68.    To implement the transfer, Global Rewards provided WEX with a list of accounts to close but noted that certain accounts would need to remain with WEX for a few more weeks. In what became a final showing of WEX's complete lack of effort to perform in good faith, WEX initially closed all of Global Rewards' clients' accounts, rather than just those identified in the list Global Rewards had provided.

***Global Rewards Was Seriously Damaged By WEX's Wrongful And Bad Faith Conduct***

69.    WEX's failure to honor its contractual obligations to Global Rewards and its bad faith actions significantly harmed Global Rewards.

70.    As mentioned above, Global Rewards enters into Client Agreements with its clients. WEX's breaches of its express and implied obligations eventually rendered Global Rewards unable to provide its clients any services, including a functioning platform. WEX lost business from both existing and new clients due to its clients' inability to perform banking functions for months, which resulted in Global Rewards not earning nearly the Incentive Fee it would otherwise have received.

71.    Additionally, WEX's failure to honor its contractual obligations to Global Rewards caused significant harm to Global Rewards' business relationships and reputation.  As a new company, it is imperative that Global Rewards refrain from causing their clients massive inconvenience and business disruption.  But WEX's actions caused just that to Global Rewards' existing clients and new clients in the queue.

72.    It took Global Rewards significant time and effort—during a global pandemic—to develop a new relationship with a new servicing bank, reach an agreement on servicing terms, and transfer over Global Rewards' remaining clients. This is especially true given Global Rewards was required to find another institution that could provide the suite of services that WEX provided, which is a combination of both banking and tech.

73.    Throughout the period of time that Global Rewards was attempting to work with WEX and then search for a new provider, Global Rewards suffered significant harm to its business and reputation, as Global Rewards was unable to provide its clients with the banking services and accounts payable platform it had promised.

## V.    <u>CAUSES OF ACTION</u>

### <u>COUNT ONE</u>
### BREACH OF CONTRACT

74.    The preceding paragraphs are incorporated herein by reference.

22

75.    The MSA is a valid and enforceable contract between WEX and Global Rewards.

76.    At all times, Global Rewards was ready, willing, and able to perform its contractual obligations under the MSA in good faith.

77.    As described above, WEX's actions constitute a breach of the MSA.

78.    Article II, Section 2.1 of the MSA ("Referral Services") obligates WEX to allow Global Rewards' to "offer its customers the ability to use Accounts issued by WEX." Ex. 1 at § 2.1.A.  To facilitate these Referral Services, the MSA provides that WEX shall provide necessary informational and credit review documents.  Ex. 1 at § 2.1.A(i).

79.    WEX breached its duty under Article II, Section 2.1 by failing to actually allow Global Rewards to "offer its customers the ability to use Accounts issued by WEX," as WEX was plainly not permitting Global Rewards' clients to use accounts issued by WEX. WEX did this by taking action aimed at preventing new or existing Global Rewards clients from utilizing the contemplated banking services as well as denying Global Rewards' client applications for no discernable reason. At risk of losing all credibility with its clients, Global Rewards eventually stopped referring new clients to WEX.

80.    Article II, Section 2.2 of the MSA ("Technology Services") obligates WEX to provide Global Rewards with the ability to use Global Rewards' payments

platform to facilitate its clients' payments through WEX's credit system from a WEX virtual card.  Ex. 1 at § 2.2(A).

81.    Similarly, Global Rewards was not able to use its platform to facilitate its clients' payments because WEX canceled many of Global Rewards' existing client accounts and failed to sign up new client accounts.  These actions resulted in Global Rewards' clients, and therefore Global Rewards itself, being *unable* to use the platform because no servicing bank was connected in order to facilitate transactions.

82.    As a direct result of WEX's unlawful conduct and breaches of the foregoing terms of the MSA, Global Rewards sustained damages in an amount to be determined at trial.

## COUNT TWO
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

83.    The preceding paragraphs are incorporated herein by reference.

84.    The MSA is a valid and enforceable contract between WEX and Global Rewards.

85.    The MSA is subject to an implied covenant of good faith and fair dealing that both parties would act in good faith and with reasonable efforts to perform their contractual duties—both explicit and fairly implied—and not to impair the rights of the other party to receive the rights, benefits, and reasonable

expectations under the MSA. This included the covenant that WEX would act fairly and in good faith in carrying out its contractual obligations to provide banking referral services and payment technology services to Global Rewards as set forth in the MSA.

86.    As set forth above, WEX breached the implied covenant of good faith and fair dealing by embarking on a gradual, concerted effort over a period of months to disrupt its contractual relationship with Global Rewards after it unsuccessfully sought to improperly terminate the MSA outright in early 2021.

87.    WEX decided to frustrate Global Rewards' business and client relationships by making improper demands, refusing to service existing clients, and refusing to onboard new clients of Global Rewards, leaving Global Rewards with no choice but to look for an alternative banking supplier similar to WEX at great cost, time, and business disruption.

88.    Specifically, WEX's took the following actions, among others, in bad faith in order to drive Global Rewards to terminate the MSA:

   a.    Purposefully processing Global Rewards' new client applications at a deliberately slow pace, sometimes leaving the application unreviewed for months at a time, despite the fact that Global Rewards' clients submitted their applications and supporting documentation in timely fashion.

b.   Refusing to provide Global Rewards with updates on client applications, forcing Global Rewards to monitor those applications themselves, and, at times, providing updates and review timelines that were disingenuous.

c.   Issuing arbitrary requests to Global Rewards for supplemental information on its clients in order to stall the review process, even though the information WEX sought was not always necessary to process a client's application.

d.   Issuing unnecessary requests for additional information to Global Rewards' existing clients who had already satisfied WEX's credit standards and had been approved.

e.   Denying Global Rewards' clients' applications for arbitrary and superficial reasons under the guise of uncreditworthiness even though those client applications were properly accompanied by supporting documentation proving that the client had sufficient credit.

89.   As a direct result of WEX's unlawful conduct and breaches of the implied covenant of good faith and fair dealing, Global Rewards has been significantly harmed and has sustained damages including quantifiable lost profits, future earnings, and reputational harm.

# VI.   ATTORNEYS' FEES

90.   Section 6.1 of the MSA, entitled Mutual Indemnification Obligations

in Article VI, provides as follows:

> [E]ach party to this Agreement shall indemnify and hold
> the other party to this Agreement, and the other party's
> subsidiaries, affiliates, directors, officers, employees,
> attorneys and agents harmless from and against any
> claims, losses, costs, damages, liabilities, judgments and
> expenses (including reasonable attorneys' fees and
> expenses and costs of settlement) caused by or arising
> from (i) any intentional or grossly negligent
> misrepresentation by either party as to its program or (ii)
> any material breach or default of this Agreement.

91.   Accordingly, pursuant to Section 6.1 of the MSA, Global Rewards

seeks recovery of its reasonable and necessary attorneys' fees and costs incurred in

connection with prosecuting this action.

# VII.   PRAYER

WHEREFORE, Plaintiff Global Rewards demands judgment against

Defendant WEX Bank, and respectfully asks the Court to:

    i.   Enter judgment for Global Rewards on all Counts of the Complaint;

    ii.   Award Global Rewards its actual damages demonstrated as a result or
proximate result of WEX's breach of contract and breach of the implied
covenant of good faith and fair dealing in an amount in excess of the
minimum jurisdictional limits of this Court;

    iii.   Award Global Rewards compensatory, special, consequential,
exemplary, and punitive damages in an amount to be determined;

27

iv.   Award Global Rewards reasonable and necessary attorneys' fees and expenses as a result of WEX's unlawful conduct and breaches of contract, pursuant to the MSA and applicable law;

v.   Award Global Rewards all costs of court;

vi.   Award Global Rewards prejudgment interest at the highest lawful rate and postjudgment interest at the highest lawful rate on the total amount of the judgment from the date of the judgment until paid; and

vii.   Award Global Rewards such other and further relief, both general and specific, at law or in equity, to which Global Rewards may show itself justly entitled.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial on all issues in this action.

Date:  March 30, 2022

KING & SPALDING LLP

Respectfully submitted,

*/s/ Israel Dahan*
Israel Dahan
KING & SPALDING LLP
1185 Avenue of the Americas, 36th Floor
New York, NY 10036-2601
Telephone: (212) 556-2100
Fax: (212) 556-2222
idahan@kslaw.com

*Attorney for Plaintiff Global Rewards LLC*