<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GLOBAL REWARDS LLC**, <br><br> Plaintiff, <br><br> v. <br><br> **WEX BANK**, <br><br> Defendant. | Civil Action No. 22-1781 (ZNQ) (RLS) <br><br> **OPINION** |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendant Wex Bank ("Defendant"). ("Motion", ECF No. 21.) Defendant filed a Moving Brief in support of its Motion. ("Moving Br.", ECF No. 21-1.) Plaintiff Global Rewards LLC ("Plaintiff") filed an Opposition to Defendant's Motion ("Opp'n", at 23) to which Defendant replied ("Reply", ECF No. 24.)

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT Defendant's Motion to Dismiss Plaintiff's Complaint without prejudice.

**I.      BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff initiated the instant action on March 30, 2022, by filing its Complaint. ("Compl." ECF No. 1.) The Complaint generally alleges damages arising from Defendant's breaches of its contractual obligations under a Master Services Agreement Referral and Technology Support

1

("MSA") between Plaintiff and Defendant, along with other bad faith conduct surrounding the parties' contractual obligations. (Compl. ¶ 1.)

Specifically, the Complaint alleges that Plaintiff provides its clients a technologically advanced accounts payable platform that streamlines corporate spending into one efficient database, while maximizing credit card rewards and rebates. (*Id.* ¶ 20.) Plaintiff launched in 2019. (*Id.* ¶ 22.) Between its launch and early 2021, and through its initial relationship with Defendant, Plaintiff signed many corporate clients and received positive feedback and gained momentum. (*Id.*) Critical to Plaintiff's platform's functionality is the ability for its clients to pre-fund a bank account and use virtual credit cards to pay vendors when amounts come due. (*Id.* ¶ 24.) As Plaintiff is a financial technology provider—but not a bank—it was necessary for it to partner with a bank who could provide this critical component. (*Id.*)

Plaintiff decided to partner with Defendant because it provides customer credit applications, maintains credit lines, issues cards, manages customer relations with clients, and serves customers worldwide. (*Id.* ¶ 26.) Defendant is owned by WEX Inc., which provides technological payment solutions across continents and industries. (*Id.*) Plaintiff initiated communication with WEX Inc. in December 2019. (*Id.* ¶ 27.) In or around March 2020, Plaintiff began negotiating the MSA with WEX Inc. on behalf of WEX. (*Id.*) The MSA was signed on May 1, 2020. (*Id.* ¶ 28.) The parties to the MSA are Plaintiff and Defendant, a subsidiary of WEX Inc. (*Id.*) Yitzchok Itzkowitz, Global Rewards' CEO, signed the MSA on behalf of Global Rewards, and Tim Laukka, WEX's President, signed the MSA on behalf of Defendant. (*Id.*)

Article II of the MSA governs the services covered by the agreement. (*Id.* ¶ 29.) The MSA permits Plaintiff to "offer to its customers the ability to use Accounts issued by WEX." (*Id.* ¶ 30.) Pursuant to subsection 2.1.A.ii., the parties agreed that the "Company [i.e. Plaintiff] shall provide

the initial contact information to WEX and that any negotiations leading to a credit agreement being extended by WEX to the potential Participant [*i.e.*, Plaintiff's client] for a WEX Program shall be the responsibility of WEX and upon authorization by WEX may also include the Company." (*Id.*)  Section 2.2 governs Technology Services and states that: "Company provides technical services in the payments industry whereby their technology enables the processing of payments.  Using Company's services, a WEX virtual card can be used to make payments through a credit system."  (*Id.* ¶ 31.)  While the "Company's Services . . . are a separate and independent service from the WEX virtual card program," the MSA provides that "Company may connect with the WEX API or other WEX licensed or proprietary systems solely for the purpose of enabling the Participant to initiate a virtual payment from WEX through the Company's system to a vendor or payee of Participant."  (*Id.*)  The MSA further provides that "Company will be allowed to interface with WEX's systems in accordance with this Agreement and has developed a technical interface . . . that will allow Participants to utilize WEX virtual card numbers within Company's system. Company and WEX may mutually agree to add additional payment capabilities at a future date."  (*Id.*)  Section 2.5 of the MSA states:

> All subsequent Participant agreements and any other documents or materials provided to Company by WEX shall contain a disclosure that WEX shall have no obligation whatsoever to any Participant until and unless the applicable Participant agreement is executed by the Participant and approved by WEX. Participants that sign an agreement will, if such agreement is accepted by WEX, have a direct business relationship with WEX and will be subject to the terms of the applicable agreement entered into by and between the Participant and WEX. WEX may suspend or terminate any Participant at their discretion pursuant to the terms and conditions of its agreement with the Participant. As a point of clarification, WEX has provided its standard terms currently in effect. All Participants that are referred by Company shall be offered such terms as the basis for any contract negotiation.

(*Id.* ¶ 32.)  Further, the MSA provides that Defendant will pay Plaintiff an Incentive Fee "based upon the total monthly net spend of Participants that were referred by Company and entered into an agreement with Wex."  (*Id.* ¶ 33.)

Plaintiff entered into separate contracts with its clients to govern the separate relationship between Plaintiff and the client (the "Participant Agreements").  (*Id.* ¶ 35.)  Upon information and belief, Defendant was aware of the existence of these Participant Agreements because Plaintiff discussed them with Defendant and WEX Inc. representatives throughout the course of their business relationship.  (*Id.*)  The Participant Agreements require Plaintiff to provide a functioning corporate card and accounts payable platform.  (*Id.* ¶ 36.)  In addition, the Participant Agreements obligate, among other things, Plaintiff to provide access to accounts through an issuing bank—which, pursuant to the MSA, was Defendant—to accomplish the financial services provided by Plaintiff's platform.  (*Id.*)  Thus, the Participant Agreements were dependent upon the relationship between Plaintiff and Defendant as established in the MSA.  (*Id.*)

On January 15, 2021, Mr. Itzkowitz, the CEO of Plaintiff, agreed to discuss the issuance of credit terms with respect to existing accounts and the onboarding of new and pending client accounts on January 22, 2021.  (*Id.* ¶ 38.)  On that scheduled January 22 discussion, instead of discussing credit terms, the WEX Inc. representatives informed Mr. Itzkowitz and Plaintiff's team that Defendant was going to terminate the MSA, effective Monday, January 25, 2021.  (*Id.* ¶ 39.)  Plaintiff was further told that, effective January 25, Defendant would stop servicing all Participant Agreements between Defendant and Plaintiff's clients.  (*Id.*)  Article V, Section 5.1 of the MSA provides that the term of the MSA shall be "for a period of five (5) years" and nothing in that Article permits Defendant's immediate, unilateral termination of the MSA and the Participant Agreements.  (*Id.* ¶ 41.)  As the MSA was signed on May 1, 2020, there remained approximately

4

four and one-half years on the Agreement's initial five-year term. (*Id.* ¶ 42.) The remainder of Article V of the MSA governs the circumstances under which a party may terminate the Agreement and provides that "if the Defaulting Party materially defaults [under the MSA], and does not cure such breach within thirty (30) days after written notice thereof is given by the Non-Defaulting Party," the Non-Defaulting Party may terminate. (*Id.* ¶ 43.) Plaintiff received no notice of a material default whatsoever, and no notice of default with thirty (30) days to cure. (*Id.* ¶ 44.) According to Plaintiff, it did not perform any act that would constitute a default under the MSA, and it undoubtedly did not perform any act constituting a material default under the MSA. (*Id.*) Article V, Section 1.2 of the MSA permits a party to immediately terminate with notice upon the occurrence of certain specified events, including bankruptcy, a material adverse change in the nature of the business, or the failure to comply with regulatory requirements, however no such event occurred. (*Id.* ¶ 45.) Importantly, the MSA provides that Participant Agreements survive any purported terminating of the MSA and that "WEX shall continue to pay the Incentive Fee to Company from and after the termination of this Agreement for the duration of such Participant's agreement term." (*Id.* ¶ 46.) Notwithstanding this provision, Defendant also attempted to terminate all Participant Agreements along with its termination of the MSA which would have constituted a further breach of the MSA and would render Plaintiff's platform useless, with many corporate clients unable to facilitate payments to their vendors through the platform or through their bank directly. (*Id.* ¶ 47.)

On January 22, 2021, Plaintiff's counsel sent an urgent letter to Tim Laukka in his capacity as Defendant's President and signatory to the MSA explaining why Defendant's planned termination of the MSA and the Participant Agreements was wholly improper under the express terms of the MSA and that termination would cause irreparable harm to Plaintiff's business and

5

reputation.  (*Id.* ¶ 48.)  After Plaintiff threatened to file an injunction, Defendant assured Plaintiff that it did not intend to take action unilaterally.  (*Id.* ¶¶ 49–50.)  Shortly after the improper unilateral termination dispute was resolved, Defendant began a new campaign to end its relationship with Global Rewards which aimed to force Plaintiff to terminate the MSA, rather than Defendant doing so itself.  (*Id.* ¶ 51.)  To this end, Defendant abused its role in Plaintiff's onboarding process by purposefully processing Plaintiff's new client applications" at a snail's pace," sometimes leaving the application unreviewed for months at a time.  (*Id.* ¶ 53.)  Plaintiff repeatedly informed Defendant that its clients' applications were stuck in a queue and pressed Defendant to provide a timeline for approval.  (*Id.* ¶ 54.)  Indeed, Defendant's sudden slowdown forced Plaintiff to monitor the status of its new clients' banking applications and to insert itself into the Participant /Defendant application process in the hopes that Defendant would finally move the applications along.  (*Id.*)  Defendant's slow application review process was completely arbitrary and differed significantly from its review process prior to the attempted termination in January 2021.  (*Id.* ¶ 55.)

In the past, Defendant efficiently reviewed, approved, and provided feedback on new client applications, but following Defendant's attempted improper termination of the MSA, Defendant repeatedly sent Plaintiff requests for miscellaneous information about its clients, which Plaintiff consistently provided to the best of its ability.  (*Id.* ¶ 56.)  Despite Plaintiff's compliance with Defendant's requests, Plaintiff did not see any movement on its clients' applications, an issue that Plaintiff consistently raised to Defendant.  (*Id.*)  Notably, Plaintiff's clients were not submitting applications in higher volumes than prior to the attempted termination and Plaintiff's clients were legitimate creditworthy entities, so review and approval of their credit applications should not have taken significant amounts of time—and certainly should not have taken longer than before the

attempted termination. (*Id.* ¶ 58.) Eventually, Defendant did make determinations on new Plaintiff's client credit applications and many were denied arbitrarily or for creditworthiness but such denials were unfounded. (*Id.* ¶ 59.) Plaintiff alleges that it is aware of instances where Defendant denied a new credit application even though the client had an existing WEX account that was opened prior to the attempted termination which it claims evinces ulterior motives. (*Id.* ¶ 60.) Defendant's misconduct was not limited to new client applications. (*Id.* ¶ 62.) On February 15, 2021, Defendant informed Plaintiff that it was not only seeking more information from new applicants—after a prolonged review period—but it had also sent requests for additional information to "most of [Global Rewards'] existing customers" who already satisfied Defendant's credit standards and had previously been approved by Defendant. (*Id.*) Defendant denied Plaintiff's client applications notwithstanding that, at the outset of Defendant and Plaintiff's relationship, Defendant specifically told Plaintiff that clients applying for under $150,000 in credit would only be required to provide company financials if their FICO score was insufficient, and clients seeking prefunded accounts would not need to provide financials so long as they provide information on the company's beneficial owners and business verification. (*Id.* ¶ 64.) Following these actions, Plaintiff decided to work with a new provider and notified Defendant of its intent to do so. (*Id.* ¶¶ 65–67.) By July 28, 2021, Plaintiff had identified a new provider and requested that Defendant facilitate the transfer of certain accounts to Plaintiff's new provider. (*Id.* ¶ 67.) To implement the transfer, Plaintiff provided Defendant with a list of accounts to close but noted that certain accounts would need to remain with Defendant for a few more weeks. (*Id.* ¶ 68.) Defendant however initially closed all of Plaintiff's clients' accounts, rather than just those identified in the list Plaintiff had provided. (*Id.*)

Plaintiff suffered damages by Defendant's conduct such that Defendant's breaches of its express and implied obligations eventually rendered Plaintiff unable to provide its clients any services, including a functioning platform. (*Id.* ¶ 70.) Defendant lost business from both existing and new clients due to its clients' inability to perform banking functions for months, which resulted in Plaintiff not earning nearly the Incentive Fee it would otherwise have received. (*Id.*) Additionally, Defendant's failure to honor its contractual obligations to Plaintiff caused significant harm to Plaintiff's business relationships and reputation as it caused its clients massive inconvenience and business disruption and took Plaintiff significant time and effort to develop a new relationship with a new servicing bank, reach an agreement on servicing terms, and transfer over its remaining clients. (*Id.* ¶¶ 71–72.)

## II.   JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states.

## III.   LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true

8

all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. (quotations and brackets omitted).

IV.     **DISCUSSION**

    A.     **BREACH OF CONTRACT**

Count I of the Complaint alleges a breach of contract claim against Defendant. Specifically, Plaintiff alleges that Article II, Section 2.1 of the MSA ("Referral Services") obligates Defendant to allow Plaintiff to "offer its customers the ability to use Accounts issued by WEX." (Compl. ¶ 78.) To facilitate these Referral Services, the MSA provides that Defendant shall provide necessary informational and credit review documents. (*Id.*) Plaintiff alleges that Defendant breached its duty under Article II, Section 2.1 by failing to actually allow Plaintiff to "offer its customers the ability to use Accounts as Defendant 'was plainly not permitting [Plaintiff's] clients to use accounts issued by [Defendant].'  (*Id.* ¶ 79.)  [Defendant] did this by taking action aimed at preventing new or existing [Plaintiff's] clients from utilizing the contemplated banking services as well as denying [Plaintiff's] client applications for no discernable reason." (*Id.*) Moreover, Article II, Section 2.2 of the MSA ("Technology Services") obligates Defendant to provide Plaintiff with the ability to use [Plaintiff's] payments platform to facilitate its clients' payments through Defendant's credit system from Defendant's virtual card. (*Id.* ¶ 80.) Plaintiff was not able to use its platform to facilitate its clients' payments because Defendant canceled many of Plaintiff's existing client accounts and failed to sign up new client accounts which resulted in Plaintiff and Plaintiff's clients being unable to use the platform because no servicing bank was connected in order to facilitate transactions. (*Id.* ¶ 81.)

In its Motion, Defendant argues that Plaintiff fails to allege a breach of contract claim because Plaintiff's allegations merely describe Defendant acting in accordance with its contractual

obligations, and do not demonstrate an actual breach. (Moving Br. at 7.) Under Utah law,[1] "[t]he elements of a breach of contract claim are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Haynes v. Dep't of Pub. Safety*, 460 P.3d 565, 567 (Utah Ct. App. 2020) (citation omitted). Defendant does not challenge the adequacy of the Complaint's allegations as to a contract or damages. Instead, the parties dispute whether Plaintiff performed its obligations pursuant to the MSA and whether Defendant breached the contract.

In its Reply, Defendant correctly notes that Plaintiff admits that it—and not Defendant—unilaterally terminated the MSA. (Reply at 3) (citing Opp'n at 11-12; Compl. ¶ 66). If Plaintiff did in fact unilaterally terminate the MSA, Defendant would be correct in arguing that Plaintiff has established that, as a matter of law, it cannot state a claim for breach of contract because it has admitted that it chose not to perform under the contract. However, that is not the case at hand. Instead, Plaintiff sufficiently pleads that it stopped performing *after* Defendant breached the MSA, which it would be entitled to should Defendant have breached first. (Compl. ¶¶ 65–66.) *See Resolution Trust Corp. v. Federal Sav. & Loan Ins. Corp.*, 25 F.3d 1493, 1501 (10th Cir. 1994) ("A material failure of performance constitutes a breach that discharges the injured party from performance. . . a breach amounts to the non-occurrence of a constructive condition of exchange and justifies the injured party's suspension of performance and termination of the contract."). Thus, the only remaining element for Plaintiff to sufficiently plead its breach of contract claim is a breach of contract by Defendant. *Haynes*, 460 P.3d at 567.

---

[1] The parties do not dispute that Utah law governs Plaintiff's claim for breach of the MSA. The Court will therefore apply Utah law to the issues presented in the Motion. *See Turner v. Aldens, Inc.*, 179 N.J. Super. 596, 601 (App. Div. 1981) ("It is well settled that the law of the state chosen by the parties will be honored so long as that choice does not contravene a fundamental policy of New Jersey.").

Under basic rules of contract interpretation, courts first look to the writing alone to determine its meaning and the intent of the contracting parties. "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 975 (Utah 2009) (quoting *Green River Ranch Canal Co. v. Thayn*, 84 P.3d 1134, 1141 (Utah 2003)). Here, the parties neither argue nor allege that the terms of the MSA are ambiguous.

A claim for breach of contract must "identify a contractual promise that was breached" and the defendant's action constituting a breach of that promise. *Willis v. Dep't Stores Nat. Bank*, 613 Fed. Appx. 755, 757 (10th Cir. 2015). However, neither of the contractual provisions identified by Plaintiff in its Complaint support its claim for breach of contract. *Keith v. Mountain Resorts Dev., L.L.C.*, 337 P.3d 213, 225 (Utah 2014) (a plaintiff's claim for breach of contract fails when, as a matter of law, the defendant did not breach the contract); *Z-Corp v. Ancestry.Com Inc.*, 382 P.3d 652, 654 (Utah Ct. App. 2016) (dismissing breach of contract claim when contract "was not one of mandated obligations but rather an attractive financial incentive"). First, Section 2.1 of the MSA (which contemplates "Referral Services") in no way obligates Defendant to permit Plaintiff's customers to use Defendant-issued accounts, as Plaintiff alleges. (Compl. ¶ 78.) Rather, Defendant correctly notes that the MSA's terms begin and end with granting Plaintiff permission to offer WEX accounts to its customers by using a permissive "may" in the agreement. (Pl. Ex. 1, "MSA" §2.1.A) ("[Plaintiff] *may* offer to its customers the ability to use Accounts issued by WEX.") (emphasis added). The MSA neither guarantees nor requires that Defendant approve accounts for any Applicant referred by Plaintiff, nor does it alter Defendant's discretion as to which accounts it decides to approve and which accounts it decides to suspend.

Insofar as section 2.1 of the MSA does not impose an affirmative obligation on Defendant, no action by Defendant short of preventing Plaintiff from advertising the opportunity to apply for Defendant's accounts to its customers could constitute a breach of that contractual provision. The Utah state court of appeals in *Z-Corp* dealt with a similar issue. There, the parties entered into a marketing contract which contained no "mandated obligations" but offered "an attractive financial incentive" that allowed each party to "make more money [by] marketing for the *other* party than it did from having the other party market for it." *Z-Corp*, 382 P.3d at 654 (emphasis original). Ancestry stopped marketing for Z-Corp, and Z-Corp sued for breach of contract. *Id.* at 653. The trial court dismissed Z-Corp's claim, and the Utah court of appeals affirmed because the parties' marketing contract did "not obligate Ancestry to engage in any particular amount or sort of advertising[.]" *Id.* at 654. The court of appeals explained that Ancestry's decision to stop its marketing activities did not amount to a breach of contract because "Ancestry never promised to market for [Z-Corp.]" *Id.* Similarly here, Defendant never promised—nor does Plaintiff allege that the MSA promises—that it would approve applications and open accounts for any Applicant Plaintiff referred. Instead, Defendant notes that it in fact "could not make such a promise, because to do so would be in dereliction of its obligations to conduct ongoing diligence of customer accounts." (Moving Br. at 15) (citing 31 U.S.C. § 5318(h)(1); 31 C.F.R. §§1020.210(a)(2)(v), 1020.220(a)(2), 1020.230(a)). As in *Z-Corp*, the crux of the MSA is the payment of an "Incentive Fee" to Plaintiff by Defendant that is calculated based on the total net monthly spend of Defendant's Customers referred by Plaintiff. (MSA § 4.1.) But even that provision of the MSA makes clear that Plaintiff is only entitled to payments for its referred Applicants who ultimately "enter[] into an agreement with WEX[.]" (*Id.*)

13

Plaintiff's reliance on Section 2.2 of the MSA to support its breach of contract claim is similarly unavailing. (Compl. ¶¶ 80–81.) Section 2.2 ("Technology Services") governs the relationship between Defendant and Plaintiff's payment processing platform *once Defendant has approved a Defendant Customer's account*. In relying on this section of the MSA, Plaintiff alleges that it "was not able to use its platform to facilitate its clients' payments because [Defendant] cancelled" accounts. *Id.* ¶ 81. For the reasons explained above, the MSA does not—and cannot—obligate Defendant to keep all of Plaintiff-referred customer accounts open. Similar to the language in Section 2.1, the Technology Services language is permissive, not mandatory. (MSA § 2.2.A) ("Using [Plaintiff]'s services, a WEX virtual card *can* be used to make payments through a credit system.") (emphasis added); *id.* at 2.2.A.ii ("[Global Rewards] *may* connect with the WEX [payment platforms] … for the purpose of enabling the [WEX Customer] to initiate a virtual payment[.]") (emphasis added). Thus, even if it is true that Defendant chose to deny some applications and terminate certain customers, these actions were consistent with the unambiguous terms of the MSA and such conduct does not constitute a breach thereof. *Global Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*, 127 F. Supp. 3d 1176, 1196. Because Plaintiff has failed to sufficiently plead that Defendant breached the MSA, Plaintiff failed to properly plead a breach of contract claim. Accordingly, the Court will dismiss Count I without prejudice.

    **B.**    **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Count II of the Complaint alleges Defendant's breach of the covenant of good faith and fair dealing. In Utah, however, a claim for breach of the covenant of good faith and fair dealing is a derivative of a breach of contract claim. *American West Bank Members L.C. v. State*, 342 P.3d 224, 230-31 (Utah 2014). When a party does not allege the existence of facts required to plead a breach of contract, it also fails to plead a breach of the covenant of good faith and fair dealing. *Id*.

Because the Court has determined that Plaintiff does not allege sufficient facts to plead a plausible claim for breach of contract, it also fails to plead breach of the covenant of good faith and fair dealing under Utah law. *Classic Air Care, LLC v. Aetna Life Ins. Co.*, Civ. No. 20-506, 2021 WL 199286, at *9 (D. Utah Jan. 20, 2021); *see also Plumb v. Univ. of Utah,* Civ. No. 20-574, 2020 WL 7249733, at *8 (D. Utah Dec. 9, 2020) (finding that although the plaintiff sufficiently pled the existence of a contract, the plaintiff's claims that the defendant "intentionally worked to defeat [the plaintiff's] expectations under the [contract]" were insufficient to plead a breach of good faith and fair dealing claim.); *Sandoval v. State Farm Mut. Auto. Ins. Co.*, Civ. No. 21-171, 2022 WL 2257242, at *6 (D. Utah June 23, 2022) (holding that "when there is no breach of an express contract term, 'there can be no cause of action for breach of an implied covenant arising therefrom.'") (quoting *Shiozawa v. Duke*, 344 P.3d 1174, 1184 n.6 (Utah Ct. App. 2015) (citing *Craner v. Nw. Mut. Life Ins. Co.*, 12 F. Supp. 2d 1234, 1242 (D. Utah 1998))). Accordingly, Count II of the Complaint will also be dismissed without prejudice.

V.    **CONCLUSION**

For the reasons stated above, the Court will GRANT Defendant's Motion to Dismiss Plaintiff's Complaint without prejudice. Plaintiff will be given thirty (30) days to file an Amended Complaint. An appropriate Order will follow.

Date: **May 24, 2023**

                                        s/ Zahid N. Quraishi
                                        **ZAHID N. QURAISHI**
                                        **UNITED STATES DISTRICT JUDGE**